[Cite as *State v. Simmons*, 2013-Ohio-1789.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 98613

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## TERRELL SIMMONS

DEFENDANT-APPELLANT

---

## JUDGMENT:
### AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-554999


**BEFORE:** Celebrezze, P.J., Keough, J., and Kilbane, J.

**RELEASED AND JOURNALIZED:** May 2, 2013

**ATTORNEY FOR APPELLANT**

Russell S. Bensing
1350 Standard Building
1370 Ontario Street
Cleveland, Ohio   44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:    Kevin R. Filiatraut
          Nicole Ellis
Assistant Prosecuting Attorneys
The Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

FRANK D. CELEBREZZE, JR., P.J.:

{¶1} Defendant-appellant, Terrell Simmons, appeals his convictions for rape and kidnapping entered after a jury trial. He argues that the trial court erred in permitting inadmissable hearsay testimony and that his convictions are against the manifest weight of the evidence. After careful review of the record and relevant case law, we affirm appellant's convictions.

{¶2} On October 5, 2011, the Cuyahoga County Grand Jury returned an indictment charging appellant with rape in violation of R.C. 2907.02(A)(2); kidnapping in violation of R.C. 2905.01(A)(3), with a sexual motivation specification; and kidnapping in violation of R.C. 2905.01(A)(4). All three offenses carried sexually violent predator specifications.

{¶3} Prior to trial, appellant waived his right to a jury trial on the sexually violent predator specifications. On April 9, 2012, the remaining counts of rape and kidnapping proceeded to a jury trial.

{¶4} At trial, the female victim, T.J., testified that she met appellant on September 26, 2011, while riding a Rapid Transit Authority bus. T.J. testified that appellant approached her on the bus and, after some conversation, invited her to his mother's house to play cards. T.J. testified that she agreed and that she spent several hours with appellant at his mother's house. According to T.J., everything was normal and she was having a "nice time."

{¶5} While T.J. was at appellant's mother's home, her friend, Monta Collier, began calling and sending threatening text messages to T.J.'s cell phone. T.J. testified that Collier became upset when he learned that she was spending time with another man. Noticing T.J.'s reaction to Collier's comments, appellant's mother suggested that appellant walk T.J. home and spend the night to protect her from Collier, who lived in T.J.'s building. T.J. testified that she thought the suggestion was "weird," and she was not comfortable with appellant walking her home, but she went along with it due to the threatening nature of Collier's phone calls.

{¶6} As T.J. and appellant walked to T.J.'s apartment, they were confronted by Collier at the bus stop. T.J. testified she was nervous that Collier and appellant "might do something to each other," so she called her father to come pick up her and appellant. When her father arrived, he drove T.J. and appellant to her apartment. When asked why she permitted appellant to go home with her when she had a safe ride home, T.J. responded, "I should have left him there, but I still wasn't thinking straight."

{¶7} When they arrived at T.J.'s apartment, T.J. informed appellant that he could not sleep with her in her bed and that he would have to sleep on the couch. T.J. testified that appellant suddenly "got mad" and started pacing back and forth while pounding his hands. When appellant called his sister to help calm him down, T.J. went into the bathroom and locked the door. When she came out, she and appellant started to wrestle, and during the altercation she fell onto the couch. At that time, appellant ordered T.J. to

move to her bed and to pull off her pants. T.J. testified that she believed appellant had a gun and that he would kill her if she did not comply.

{¶8} T.J. testified that appellant positioned himself on top of her and penetrated her vagina with his penis, without her consent. T.J. stated, "he pushed himself inside me and had sex with me. I was crying. He told me to stop crying and act like I'm into it. I stopped making crying noises but the tears were just running down my face." When appellant was finished with her, he laid on top of her and "held [her] tight." T.J. testified that when appellant got off her, she pretended to do homework, and she waited for appellant to fall asleep.

{¶9} Once appellant fell asleep, T.J. sent a text message to a friend she knew as "Tootie," who lived in the apartment building. T.J. sent three separate text messages to Tootie asking her to contact the police because she had just been raped and the man was still inside her apartment. When Tootie did not respond, T.J. woke appellant and asked him to take her to a hospital or to go with her to buy marijuana because she had severe stomach pain. T.J. testified that appellant agreed that he would go with her to purchase marijuana. T.J. stated that she and appellant then walked to a nearby gas station to buy a "shell" used to smoke marijuana. When they returned to the apartment building, T.J. convinced appellant to let her stop at Tootie's apartment so she could purchase marijuana. When Tootie answered her door, T.J. immediately pushed her way inside, locked the door on appellant, and called the police.

{¶10} Lawanda Black, a.k.a. Tootie, testified that on September 27, 2011, she was sleeping when T.J. knocked on her door. Tootie stated that when she opened the door, T.J. looked like she was scared and had been crying. Tootie testified that when T.J. came inside the apartment, she asked Tootie to "hurry up and lock the door" on appellant. Once inside, both T.J. and Tootie called the police because appellant was banging on the apartment door. Finally, Tootie confirmed that T.J. sent her three text messages indicating that T.J. had been raped, but stated she did not read them until after T.J. knocked on her door because she was sleeping.

{¶11} Officer Daniel Smith of the Cleveland Police Department testified that he responded to T.J.'s apartment complex on a report of sexual assault with the suspect still on the scene. When Officer Smith arrived at the apartment complex, he was let into the building by appellant. Officer Smith noticed that appellant matched the description of the suspect and apprehended him for further investigation. After conferring with T.J., Officer Smith placed appellant under arrest.

{¶12} At the hospital, T.J. was examined by Jessica Malave, a sexual assault nurse examiner ("SANE nurse"). Malave testified that on September 27, 2011, she conducted T.J.'s initial medical interview and subsequently obtained her voluntary consent to perform a rape kit. Malave testified that she documented T.J.'s statements "verbatim" in T.J.'s medical records, identified as state's exhibit No. 1. During the interview, T.J. told Malave that at approximately 12:03 a.m. on September 27, 2011, a "stranger" penetrated her vagina with his penis without her consent. Additionally, Malave testified that, as part

of her examination, she is required to ask the patient to provide a written narrative, stating the history of the events in her own words. Over appellant's counsel's objection, the trial court permitted Malave to read T.J.'s detailed account of her rape into the record.

{¶13} Dr. David Neimer, a forensic scientist at the Ohio Bureau of Criminal Identification and Investigation, testified that he performed a DNA analysis on the vaginal swabs taken from T.J. As a result of the testing, Dr. Neimer discovered a DNA profile in the vaginal swabs that was consistent with appellant's DNA. Accordingly, Dr. Neimer testified that "Terrell Simmons [could] not be excluded as the source of the semen on the vaginal swabs."

{¶14} At the conclusion of the trial, the jury found appellant guilty of rape in violation of R.C. 2907.02(A)(2) and kidnapping in violation of R.C. 2905.01(A)(4). The jury was unable to come to a verdict on the remaining count of kidnapping in violation of R.C. 2905.01(A)(3), which was subsequently dismissed without prejudice by the state.

{¶15} On May 31, 2012, the trial court conducted a hearing on the sexually violent predator specifications and found appellant guilty of those specifications. At sentencing, the trial court merged the rape and kidnapping counts and proceeded to sentence appellant on the rape count. Thereafter, appellant was sentenced to a term of life in prison, with the possibility of parole after 15 years.

{¶16} Appellant brings this timely appeal, raising two assignments of error for review.

**Law and Analysis**

# I. Admissibility of Evidence

{¶17} In his first assignment of error, appellant argues that the trial court erred in permitting the state to have SANE nurse, Jessica Malave, read T.J.'s out-of-court statement to the jury. Appellant contends that T.J.'s statements made during the medical examination were hearsay and were not made for the purposes of medical diagnosis or treatment, and therefore did not fall within the hearsay exception under Evid.R. 803(4).

{¶18} The admission or exclusion of evidence is a matter left to the trial court's sound discretion; therefore, it will not be disturbed absent an abuse of discretion. *State v. Frazier*, 8th Dist. No. 97178, 2012-Ohio-1198, ¶ 17. An abuse of discretion is a decision that is unreasonable, arbitrary, or unconscionable, rather than a mere error in judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

{¶19} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Pursuant to Evid.R. 802, hearsay is inadmissible unless it falls within an exception provided by the rules of evidence. Should hearsay statements be admitted improperly, however, such error does not necessarily require reversal of the outcome of the trial if it was harmless. *See Arizona v. Fulminante*, 499 U.S. 279, 306-309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

{¶20} Crim.R. 52(A) describes a harmless error as one that "does not affect substantial rights [and therefore] shall be disregarded." In order to find harmless error in a criminal matter, a reviewing court must find that the error was harmless beyond a

reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). When determining whether the admission of evidence is harmless, this court must find that "there is no reasonable probability that the evidence may have contributed to the defendant's conviction." *State v. Jones*, 9th Dist. No. 24469, 2010-Ohio-879, ¶ 46.

{¶21} Evid.R. 803(4) allows, as an exception to the hearsay rule, the admission of "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." The staff notes to the rule provide in pertinent part:

> The circumstantial guaranty of trustworthiness of this exception is derived from the assumption that a person will be truthful about his physical condition to a physician because of the risk of harmful treatment resulting from untruthful statements. * * * The exception is limited to those statements made by the patient which are reasonably pertinent to an accurate diagnosis and should not be a conduit through which matters of no medical significance would be admitted.

Staff Notes to Evid.R. 803(4).

{¶22} "When examining the admissibility of hearsay statements under Evid.R. 803(4), the primary inquiry is whether the statements were made for the purposes of medical diagnosis or treatment, as opposed to some other purpose." *Fields v. CSX Transp., Inc.*, 197 Ohio App.3d 561, 2011-Ohio-6761, 968 N.E.2d 70, ¶ 17 (8th Dist.). As expressed by the Ohio Supreme Court: "The test under Evid.R. 803(4) goes solely to whether a statement was made for purposes of medical diagnosis or treatment. If a

statement is made for purposes of diagnosis or treatment, it is admissible pursuant to Evid.R. 803(4)." *State v. Dever*, 64 Ohio St.3d 401, 414, 1992-Ohio-41, 596 N.E.2d 436.

{¶23} At trial, Malave testified that she treated T.J. at MetroHealth Medical Center on September 27, 2011. She stated that, over the course of her direct examination, she obtained various information from T.J. concerning the nature of the rape, including the number of assailants and "exactly what happened as far as vaginal penetration, anal penetration, and any kind of oral contact." Malave explained that such information was necessary to effectively treat T.J. and collect specimens for her rape kit. Next, Malave testified that as standard procedure, she asked T.J. to provide a narrative of the rape in her own words. Over defense counsel's objection, the trial court permitted Malave to read T.J.'s word-for-word account of the incident into the record.

{¶24} The narrative stated, in pertinent part:

I was on my way home from school on the bus and he just came up to me and started talking. When it came to my bus stop he came off exit with me. We went to his family's house and we talked. I met his family and talked with his mom * * * His mom talked him into walking me home. I told him that he could sleep on the couch and then he said, you seriously are going to make me sleep on the couch? * * * Then he said, I'm about to really blow up. * * * I was on my bed and he came up into my face. I asked him to please get out of my face. He kept swearing at me and telling me to sit the fuck back and had his hand in a fist. * * * Then he started getting really mad. * * * I told him I had to go to the bathroom but he wouldn't let me leave. I had my phone in my hand and he hit the phone out of my hand. We were wrestling for a while. He told me to sit on the bed and to lay back and pulled my shorts off. He kept telling me to shut the fuck up. I was laying down and he just shoved it in me really hard. He kept telling me that I need to get into it and stop crying. He laid on top of me for 20 to 27 minutes just holding on to me when he was done to make sure that it all got

in there. Then he made me look into his eyes and he said that I made him do this. He kept hugging me so I had to pretend like everything was okay so I could get him out of my apartment. He was lying in the bed so I pretended that I was doing homework. I went to the bathroom once he fell asleep so I could text my friend to get help. No one answered so I told him I had to go to the store and when we came back I knocked on my friend's door and locked myself in so I could call 911.

{¶25} On review of the record, it is evident that the information concerning T.J.'s physical injuries and how she was raped was necessary for proper medical treatment and diagnosis. However, we can find little evidence to suggest that T.J.'s narrative aided in any sort of diagnosis or medical treatment. Rather, the details provided by T.J. in the narrative, such as how she met appellant, appellant's statements and demeanor during the rape, and T.J.'s actions following the rape, were not for the purpose of medical treatment, but rather related primarily to the investigation of appellant.

{¶26} Based on the foregoing, we are obligated to find that Malave's testimony concerning T.J.'s narrative would not fall within the hearsay exception under Evid.R. 803(4). However, as discussed below, the admission of these hearsay statements did not violate appellant's confrontation rights, and otherwise constituted harmless error. Therefore, we do not find that reversal is required in this matter.

{¶27} Although not argued by appellant, the testimonial nature of the improperly admitted hearsay statements raises the issue of the Confrontation Clause. In this case, however, T.J., the declarant, testified at trial and was subject to cross-examination. Therefore, because defense counsel was able to cross-examine T.J., appellant's confrontation rights were not violated. *See State v. Gray*, 12th Dist. No. CA2011-09-176, 2012-Ohio-4769, ¶ 48 (noting that when the declarant is present at trial

and subject to cross-examination, the Confrontation Clause presents no constraints on the use of the prior testimonial statement). Moreover, Malave was also present at trial, and the defense was entitled to cross-examine her on her recitation of T.J.'s statements.

{¶28} Additionally, the error in admitting T.J.'s narrative was harmless pursuant to Crim.R. 52(A) because it was merely cumulative to the admissible testimony of T.J. *See State v. Greer*, 8th Dist. No. 91983, 2009-Ohio-4228, ¶ 59.

{¶29} In the case at hand, T.J. took the stand and provided substantial testimony regarding the events of the night, including the information provided in her narrative. Further, defense counsel conducted a substantial cross- examination relating to T.J.'s statements about her interaction with appellant. Accordingly, the jury was able to independently assess her credibility. *State v. Cappadonia*, 12th Dist. No. CA2008-11-138, 2010-Ohio-494, ¶ 20. As a result, it cannot be said that the result of the trial would have been otherwise, absent the inclusion of the narrative at trial. We therefore find that the trial court's error in admitting the narrative was harmless beyond a reasonable doubt.

{¶30} Appellant's first assignment of error is overruled.

## II. Manifest Weight

{¶31} In his second assignment of error, appellant argues that his convictions were against the manifest weight of the evidence.

{¶32} A manifest weight challenge questions whether the prosecution met its burden of persuasion. *State v. Ponce*, 8th Dist. No. 91329, 2010-Ohio-1741, ¶ 17, citing

*State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982).  The manifest weight of the evidence standard of review requires us to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *State v. Otten*, 33 Ohio App.3d 339, 515 N.E.2d 1009 (9th Dist.1986), paragraph one of the syllabus.  The discretionary power to grant a new trial should be exercised only in exceptional cases where the evidence weighs heavily against the conviction.  *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541.

{¶33} We are mindful that the weight to be given the evidence and the credibility of the witnesses are matters primarily for the trier of fact.  *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.  The trier of fact has the authority to "believe or disbelieve any witness or accept part of what a witness says and reject the rest."  *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).  "The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact."  *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986).

{¶34} Appellant was convicted of one count of rape pursuant to R.C. 2907.02(A)(2), which states: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of

force." Appellant was also convicted of kidnapping in violation of R.C. 2905.01(A)(4), which states in pertinent part:

> No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will.

Sexual activity includes vaginal intercourse between a male and female. R.C. 2907.01(A)(C).

{¶35} In challenging the weight of the evidence, appellant maintains that T.J.'s testimony concerning her actions before and after the rape was "incomprehensible" and, therefore, not credible. He alleges that the greater weight of the evidence suggested a consensual sex act occurred between him and T.J. We disagree.

{¶36} At trial, T.J. testified that once she and appellant entered her apartment, appellant became upset when T.J. told him that he would be sleeping on the couch. According to T.J., appellant then ordered her in an "aggressive voice" to sit down on her bed and to take off her pants. Thereafter, appellant "pushed himself inside [T.J. ] and had sex with [her]" as T.J. cried. T.J. testified that she told appellant that she did not want to have sex with him, but believed he would kill her if she did not comply with his demands. The fact that T.J. gave appellant permission to enter her apartment before the sexual act occurred and pretended to work on homework thereafter does not negate her testimony that she did not consent to the sexual conduct. The jury, as the trier of fact, was in the best position to weigh the credibility of the witnesses and was free to believe all, part, or none of the testimony of each witness. Thus, it was well within the province

of the jury to credit the version of events offered by the state's witnesses and to reject the version of events offered by defense counsel.

{¶37} After reviewing the entire record and weighing the evidence and all reasonable inferences, including the credibility of the witnesses, we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered.

{¶38} Appellant's second assignment of error is overruled.

{¶39} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


FRANK D. CELEBREZZE, JR., PRESIDING JUDGE

KATHLEEN ANN KEOUGH, J., and
MARY EILEEN KILBANE, J., CONCUR